WASHINGTON SECURITIES CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 13, 1912.)

No. 1,988.

1. PUBLIC LANDS (§ 120*)—COAL LANDS—HOMESTEAD ENTRY.

   Where the patentees who obtained patents on certain mineral land under homestead entries had been engaged in mining in the vicinity of the land, which was in the midst of a well-known coal mining region, prior to the time they attempted to enter the land as homestead, and at the time they made their applications well knew that the land was not subject to entry under the homestead law, and falsely stated in their affidavits and final proof that the land was chiefly valuable for agriculture, the patents so obtained were subject to cancellation as between the parties at the suit of the government.

   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

2. PUBLIC LANDS (§ 120*)—COAL LANDS—HOMESTEAD ENTRY—PATENT—TRANSFER.

   A grantee of certain land which the government had been induced to patent to homesteaders by false and fraudulent proof that it was chiefly valuable for agriculture *held* not a bona fide purchaser, and that the patents were therefore subject to cancellation at the suit of the United States as against them.

   [Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 120.*

   Bona fide purchasers of public lands, see note to United States v. Detroit Timber & Lumber Co., 67 C. C. A. 13.]

3. PUBLIC LANDS (§ 35*)—COAL LANDS—"MINERAL LANDS."
    Coal lands are "mineral lands" within the United States statutes with
reference to the sale of the public domain, and therefore cannot be le-
gally acquired under and by virtue of the homestead laws.
    [Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 35.*
    For other definitions, see Words and Phrases, vol. 5, pp. 4515, 4516.]

Appeal from the Circuit Court of the United States for the North-
ern Division of the Western District of Washington.

Bill by the United States against the Washington Securities Com-
pany for the cancellation of patents to certain coal land patented un-
der homestead entries and conveyed to defendant. From a decree in
favor of complainant, defendant appeals. Affirmed.

By its bill filed in the court below the government sought the cancellation
of four certain patents covering section 34, township 22 N., of range 7 E., of
the Willamette meridian, in the Seattle land district, state of Washington,
which were issued to four named individuals, for one-quarter of a section
each, under and by virtue of the homestead law of the United States, the
title to which subsequently passed to the appellant corporation from the pat-
entees. The bill charges that all of the land mentioned was at all of the
times therein referred to known mineral land, containing valuable deposits of
coal in such quantities and of such character as rendered the land more val-
uable for the coal it contained than for agricultural purposes, which facts
each of the patentees well knew at the time he made application to purchase
a quarter section thereof under the homestead law, and at the time of final
proof and the receipt of the patent, and all of which facts the appellant cor-
poration well knew through its agents and officers at the time of its purchase,
and further knew that all of the said land was known mineral land at the
time the said respective patentees made application to purchase it under the
homestead laws, and at the time they made their proofs under and pursuant
to such applications and at the time they received the said patents. The bill
makes similar allegations in respect to each of the patentees. It will be suf-
ficient to state the substance of one of them, which is as follows: That on
September 10, 1900, one Zachariah Turner filed with the proper officers of the
United States Land Office at the city of Seattle, Wash., an application in
writing and entered as a homestead the E. ½ of the E. ½ of section 34 of
township 22 N., of range 7 E., of the Willamette meridan, and at the time of
filing the same also filed his nonmineral affidavit in accordance with the duly
established rules and regulations of the Land Office, in which affidavit he
stated, among other things, that he was well acquainted with the character of
the land applied for, and that there was not, to his knowledge, within the
limits thereof, any deposit of coal; that thereafter, on the 9th day of Jan-
uary, 1902, the said Turner, desiring to commute his homestead entry upon
the said land so applied for, made and filed in the said Land Office his final
proofs, together with the nonmineral affidavit required by the rules and regu-
lations of the Commissioner of the General Land Office, and in his testimony
upon final proof in the said Land Office testified upon oath, among other
things, that the said land was most valuable for agricultural purposes, and
that there was not any indication of coal on it; that the affidavit so made
and filed and the testimony so given were false and fraudulent, as the said
Turner well knew at the time, and were made and given by him for the pur-
pose of fraudulently obtaining from the United States the title to said land;
that the land was unfit for agricultural purposes, and was of no value there-
for, but did contain valuable workable deposits of coal, all of which the said
Turner at the time well knew; that on the 9th day of January, 1902, the
officers of the Seattle Land Office, based upon the said final proof, through
mistake and inadvertence and without authority of law, issued to the said
Turner a receiver's receipt for the land so applied for by him, and thereafter,
to wit, November 2, 1904, a patent was issued to him by the United States

—————————
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

conveying the said land, which patent was issued through mistake and inadvertence on the part of the officers of the Land Office, and without authority of law: that on the 10th day of October, 1906, the said Turner and his wife, Mary Turner, by deed conveyed the said land to one C. J. Smith, who was at the time the agent of the defendant corporation for the purchase of the said land, and who acquired it solely for the use and benefit and in trust for the defendant to the suit, which corporation still holds the legal title thereto; that the said defendant corporation and its said agent well knew at the time of such purchase, and for a long time prior thereto, that the said land contained valuable deposits of coal and was mineral land, and was unfit for agricultural purposes and of no value therefor, and was not subject to entry under the homestead laws of the United States.

The bill contains similar allegations in respect to all of the other portions of the section in question. It contains no charge of fraud against the defendant company or its agent, nor against any of the officers of the Land Office.

The defendant company by its answer admits, among other things, that the section of land in question contained and still contains valuable and workable deposits of coal, and that the patents were issued as alleged, and that the land covered by them was thereafter conveyed by the patentees to Smith as agent of the defendant company and was subsequently conveyed by him to the company, which still holds the legal title thereto. In other respects the answer put in issue the averments of the bill.

Charles P. Spooner and H. R. Clise, for appellant.

Elmer E. Todd, U. S. Atty.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). [1] There are some peculiar features about this case. The record contains undisputed evidence, and an abundance of it, to the effect that coal was discovered in and upon the land in question in the year 1882, and that shortly thereafter an association of individuals was formed for the purpose of developing the coal deposits, which efforts continued for a number of years, and in which efforts about $8,000 were expended. One of that syndicate was a man named John L. Howard, who took in his own name, but for the benefit of the Oregon Improvement Company, a corporation of which he was at the time the manager, a one-third interest in that mining venture. The evidence further shows that each of the patentees had been engaged in mining in the vicinity of the land in question, which is in the midst of a well-known coal-mining region, and the evidence leaves no room for doubt that each of the so-called homesteaders well knew, at the time he made his application for the entry of a portion of the land as a homestead, that it was not subject to entry under the homestead law, but was well-known mineral land, and that their affidavits in respect to the character of the land were false and fraudulent, as was their testimony on final proof. As against them, therefore, there could be no doubt of the right of the government to a decree canceling the patents issued to them. The only question is, Is the defendant company, appellant here, entitled to protection as an innocent purchaser?

[2] One of the peculiar features to which reference has been made is that, while the homestead applications were pending in the local land office, it seems to have been brought to the attention of its officers in some way not shown, and also in some undisclosed way to

the Commissioner of the General Land Office (as we find in one place in the record a reference to the vacation of a suspension of the homestead entries by that officer), that the land in question was claimed to be mineral land. For instance, it appears from the testimony of one of the government's witnesses, Sidney J. Williams, that shortly after the land was surveyed, and just after the filing of the homestead applications, he sought to procure a portion of it under the law governing the disposition of mineral lands, and tendered to the officers of the local land office the government price for such land, which application and tender they rejected. His testimony in part is as follows:

"Q. But did you file on that quarter section, while others were filing in conjunction with you, filing on other quarters on that section? A. When I made the filing and made the tender of the money, I filed alone at that time.

"Q. What year was that? A. I don't remember the year. It was about—

"Q. [Interrupting]: '96 or '97? A. I think it was, about; I don't know. The records show the filing. I don't remember.

"Q. It was shortly after the land was surveyed, wasn't it? A. I don't remember just exactly when it was, but the record shows. I made my filing and I made my tender of the money to the office here.

"Q. Any way you filed on it before—what was the condition, at what stage were these homesteaders in when you filed? A. They had just filed.

"Q. They had just filed? A. They had filed on it also, but hadn't made their final proof.

"Q. Did you keep your filing good? A. Yes, sir; I made a tender of the $3,200 to the Land Office.

"Q. Then you contested their filing, did you? A. No; it didn't go any further. They refused to accept my money, the Land Office here. It was more valuable for other purposes, and gave me back my money.

"Q. And what, if any, showing did you make to substantiate your filing? A. I made the same talk I have made here about the coal being there.

"Q. In what way did you make that showing? A. I had witnesses.

"Q. That was before the office here? A. Yes, sir.

"Q. And as the result of that showing they refused to accept your tender? A. Returned—

"Q. [Interrupting]: And turned down your filing? A. Yes, sir."

The witness then testified that he thereupon dropped the matter. The record contains no evidence that there was any formal contest in the Land Office between any of the mineral claimants and the homesteaders, or that any proof was introduced before those officers respecting the true character of the land. It does, however, clearly show that the defendant company's agent, in acquiring the patentees' title to the land covered by the patents, well knew that before and at the time of the filing of the homestead applications the land was claimed to be mineral land, for the record shows that he was one of the officers of the Oregon Improvement Company, succeeded Howard as manager of that company, and personally directed for several years the payment of that company's one-third part of the expenses incurred by the syndicate in developing the coal veins upon the land. The contention on the part of the appellant company that that knowledge had passed from its agent's mind at the time he negotiated on behalf of the appellant for the title to the property conveyed by the patents cannot be sustained in view of the evidence.

Mr. C. J. Smith was that agent. According to his own testimony,

from 1891 to about 1898, he was general manager of the Oregon Improvement Company, which company, in addition to its railroad and steamship business, owned and operated the Franklin and New-castle coal mines in the vicinity of the land in question, and which company, through its former manager, Howard, had secured a one-third interest in the undertaking to acquire the section of land here in question as coal land, but which the patentees obtained by the fraudulent means already indicated. Mr. Smith, who subsequently acquired the title thus conveyed by the patents for the appellant company and transferred the land to it, was examined as a witness on behalf of the government, and then testified as follows:

"Q. Mr. Smith, at the time you purchased this land from the homesteaders, what position did you occupy with the Washington Securities Company? A. The Washington Securities Company was not formed at that time. It was just in process of being formed.

"Q. It was in process of being formed? A. Yes.

"Q. And you purchased this land for the corporation which was to be formed, did you not? A. Yes.

"Q. And with its funds? A. Yes, sir.

"Q. What position did you hold in the Washington Securities Company upon its organization? A. Vice president.

"Q. What other position——were you one of the trustees or directors? A. Yes.

"Q. Were you one of the original promoters of the company? A. Well, I subscribed to the stock at the beginning, at the formation of the company.

"Q. Did you interest the corporation in this particular piece of property? A. Well, I brought it to their attention; yes.

"Q. And you are still, and at the time you deeded the property over to the company you were, the vice president and one of the trustees? A. Yes, sir.

"Q. And you had bought it solely for the use of the corporation which was afterwards to be formed? A. Yes.

"Q. During the time you were connected with the Oregon Improvement Company did you visit the Franklin mine from time to time? A. Yes, sir.

"Q. How often would you say? A. Well, I don't remember; whenever it was necessary.

"Q. Once a month? A. Well, it was——the periods were too irregular.

"Q. The Oregon Improvement Company owned the railroad that ran up there at that time? A. Yes, sir."

Being asked on cross-examination in what way he brought the property to the attention of the appellant, and in what way it was brought to his attention, the witness answered:

"A man by the name of Braggs (afterwards given as Brooks) came to me and told me he had some coal land, wanted to know if I was interested in coal, and I asked him where the land was. He told me it was in section 34, township 22, 7, I think it was, and I told him that I was not, that I didn't believe that I cared to be interested, and he asked me if there was anybody that he could obtain as a purchaser, that he had an option on the land. I referred him to C. R. Collins, who at that time was hunting for some coal land with the expectation of getting coal that would be adaptable for gas purposes. He had some negotiations with Mr. Collins, and Mr. Collins came to me and said that he would take it if I would take an interest, which I declined to do; and Mr. Collins took it up with some people in the East, and, not obtaining the necessary funds, told Mr. Braggs that he was unable to carry out his plans, and Braggs came back to me again, and in the meantime the Washington Securities Company was about to be formed and their stock was then being subscribed, and I referred Mr. Braggs to the Securities Company. He had a talk with Mr. Clise, who expected to be the president of the company and who was promoting it, forming it, and Mr. Clise discussed

the question with me and Mr. Braggs, and I told him that—I gave him the name of an engineer—mining engineer, that would exploit the land—that is, would make examination—and that I knew nothing personally about the land myself, but would rely upon a report that this man would make; and at my suggestion the man was employed to go there and look the land over. After he had looked it over, the matter of purchase was taken up between myself and Mr. Braggs, and an option was taken for a sufficient length of time to enable us to verify the report of the engineer, and upon the verification of those reports and the abstract of title the land was purchased."

The witness, when subsequently called on behalf of the defendant company, gave substantially the same testimony as to what occurred between him and Braggs or Brooks, and further testified, on cross-examination, that as manager of the Oregon Improvement Company he paid that company's proportion of the expenses of "keeping up the coal declaratory statements" on the land, and that, when he purchased the land from the homesteaders, he had an abstract of the title made and examined by the attorney for the defendant company, who was also one of its directors. Being asked by the company's attorney what, if any, effect his prior information in respect to the character of the land had on his mind at the time Brooks approached him on the subject of purchasing the property, and whether he knew that the patented land was the same land in respect to which he had made the payments, the witness answered:

"He informed me it was section 34, located near Kanascott, and he asked whether I knew about it, and I told him no, and he went on to describe then its location with reference to other mines there beyond Franklin and within the range of Kangley and Drum and Alta and some other pieces of property that had been more or less exploited in that part of the country, and I told him, then, that I had an indistinct remembrance that that had been brought to my attention some years before, but that I had never seen any report or examination of it, I was not aware of the value of it, and I did not know whether it was coal or not, and I did not care to go any further with it, that was as to myself personally. When the company was formed, I referred it to them, and they desired first an examination. Upon that examination they made their purchase.

"Q. Was the examination made based in any way upon what you have stated existed away back in '90 and '91? A. No, sir; in fact, I did not know there were tunnels on the property.

"Q. How is that? A. In fact, I did not know whether there were any tunnels or open prospects on the property, or that there ever had been.

"Q. When did you first find that out? A. When the examination was made they took some, the expert took some men with him, and in looking over the ground they uncovered some prospect holes and dug out some tunnel that had been more or less filled with water and débris.

"Q. I wish you would state whether or not from the report that you had from the men whom you sent there and from such other knowledge you had whether or not that property, as coal property, is anything more at the present time than a prospect? A. Well, no; it is a probability. It could not be determined as a mine, and in fact I was loath, even after the report was made, to take hold of it until I had secured some additional information with reference to a rock dyke that runs fairly close to that property up there, and which, in my opinion, is the reason why one of the contiguous pieces of coal property was worthless, the rock dyke having practically coked the coal in the mine, and rendered it entirely worthless."

We are of the opinion that Smith's own testimony shows that at and before his purchase of the property from the homesteaders for the Securities Company he knew that it was the same land he had

claimed to be coal land while manager of the Oregon Improvement Company, and that his actions above indicated in respect to the land were then present to his mind. The abstract of title necessarily showed that the land was acquired from the government by the proposed sellers under and by virtue of its homestead laws. There is, therefore, nothing in the case of Harrington v. United States, 11 Wall. 356, 20 L. Ed. 167, precluding the affirmance of the judgment.

[3] That coal lands are mineral lands within the meaning of the United States statutes is well settled, and that land known at the time to be mineral land cannot be legally acquired under and by virtue of the homestead law of the United States is also too well settled to need the citation of authorities.

The appellant company not being an innocent purchaser, and the patents in question having been acquired by the gross fraud of the patentees, the decree annulling them is affirmed.